## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>          **Plaintiff,**<br>     **v.**<br><br>**JAMES P. ANGLIM,**<br><br>          **Defendant.** | **Civil Action No. 23-CV-** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendant, James P. Anglim ("Anglim" or "Defendant"):

## SUMMARY

1.      This is a securities fraud enforcement action.  Starting in November 2016 and continuing through at least February 2022 (the "Relevant Period"), Anglim engaged in multiple deceptive and manipulative schemes to assist various people who controlled large blocks of public company stock ("Control Persons") to sell that stock to investors in the public over-the-counter (or "OTC") markets while concealing that they were behind those sales.

2.      During the Relevant Period, Anglim was employed as a registered representative of two different United States-based brokerage firms that engaged in "market making" activities. A "market maker" is a broker-dealer firm that provides liquidity to stock markets by publicly quoting both a buy price (a "bid") and a sell price (an "offer" or an "ask") for stocks and offering to trade with the public at those prices.  Anglim's job was to trade stocks on behalf of the two firms that employed him.

3.      Anglim abused his position as a trader working for market makers to facilitate the

illegal sale of stock into the public markets by several Control Persons in at least five different public companies' shares.  Anglim's conduct helped those Control Persons to dump large quantities of stock into the public markets while concealing that they were the source of all of those sales, thus avoiding disclosure requirements imposed by the federal securities laws.  The Control Persons were not customers of the brokerage firms where Anglim was employed. Nonetheless, Anglim entered into repeated arrangements with several Control Persons whereby: 1) the Control Persons would tell Anglim they wanted to sell a particular company's stock, how much they wanted to sell, and often at what prices they wanted to sell; 2) Anglim would use his position as a trader at a market maker firm to sell short the shares of that company's stock, at prices directed by the Control Persons; and 3) Anglim would cover his short positions in that company's stock by arranging with the Control Persons to purchase shares of that company's stock from them -- often at pre-arranged prices.

4.      Anglim's trading often resulted in riskless profits for him and for his employers and facilitated the Control Persons' dumping of their shares at manipulated prices into the market.

5.      On behalf of Control Persons, Anglim engaged in at least $53.85 million of trading in the securities of at least the following companies: Proto Script Pharmaceutical Corp., Digatrade Financial Corp., 12 Retech Corp., Homie Recipes Inc. and Charlestowne Premium Beverages, Inc.

6.      As a result of the conduct alleged herein, Anglim violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)(1), (3)], Section 9(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78i(a)] and Section 10(b) of the Exchange Act and Rules

10b- 5(a) and (c) thereunder [[15 U.S.C. §§78j(b); 17 C.F.R. §240.10b-5(a), (c)].

7.     The Commission seeks permanent injunctions against Anglim, enjoining him from engaging in the transactions, acts, practices, and courses of business of the type alleged in this Complaint, disgorgement of ill-gotten gains from the unlawful conduct set forth in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)], together with prejudgment interest, an order barring Anglim from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. §78u(d)], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C  §78u(d), 78u(e) and 78aa].

9.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C  §78aa.  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred with the District of Massachusetts, and were effected, directly, or indirectly, by making use of means of instrumentalities of transportations or communication in interstate commerce, or the mails.  For example, during the periods of manipulative activity described in this Complaint, individuals who reside in the Commonwealth of Massachusetts purchased the stock of Proto Script Pharmaceuticals, Inc., Digatrade Financial Corp., Homie Recipes Inc., and Charlestowne Premium Beverages, Inc.

## THE DFENDANT

10.     James P. Anglim, age 50, resides in Manasquan, New Jersey.  From May 2019

until October 2022, Anglim was a registered representative of a broker-dealer firm that was registered with the Commission and that acted as a market maker dealing in OTC and other securities.  From January 2015 to April 2019, Anglim was a registered representative of a second broker-dealer firm that was also registered with the Commission and that also acted as a market maker dealing in OTC and other securities.  Anglim was active in the financial services industry as a broker-dealer registered representative between March 1998 and October 2022.

## BACKGROUND

11.     The stock involved in the scheme was "penny stock," which generally refers to companies with low market capitalizations, and with stock that trades at less than $5 per share. Some of the stock involved in this scheme was "restricted stock" that was originally issued by a company (the stock's "issuer") in a private transaction that was not registered with the Commission.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  Such registration statements are often filed with the Commission on Form S-1 and are often referred to as "S-1 registration statements."  S-1 registration statements contain important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  They also disclose any person or group who is the beneficial owner of more than 5% of the company's securities.

12.     An "affiliate" of an issuer is a person or entity that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct the management and policies of the company in question.  Affiliates include officers, directors and controlling shareholders, as

well as any person who is under "common control" with, or has common control of, an issuer. As used herein, the term "Control Persons" means people or a group of people who collectively were an "affiliate" of an issuer.

13.     During the entire Relevant Period, Anglim worked at broker-dealer firms that acted as market makers for certain securities.  Section 3(a)(38) of the Exchange Act defines a market maker as "any specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis."

14.     A market maker provides market liquidity in an equity security by publicly quoting both a buy and sell price in that equity security.  A market maker expects to profit by receiving the difference between the highest price that a buyer is willing to pay for that stock and the lowest price that a seller is willing to accept (called the "bid-ask spread").

15.     High stock price volatility or a lack of liquidity will tend to increase the size of the bid-ask spread, while smaller spreads indicate higher liquidity.

16.     The Over-the-Counter ("OTC") Market is a stock quotation service that facilitates public trading of shares in small companies that are not listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).  Stock traded on the OTC Market is often thinly traded, meaning it trades at a lower volume and can therefore be susceptible to price manipulation by undisclosed Control Persons, who secretly amass large amounts of stock.

17.     "Public float" refers to the number of shares of an issuer's stock that is on deposit with broker-dealers and available for trading in the marketplace, including on the OTC Market. An issuer's public float is distinct from its total outstanding shares, which also includes restricted

stock issued by the company but not available for public trading.

18.     The buying and selling of penny stocks traded on the OTC Market relies on brokerage firms that engage in market making activities.  Traders, like Anglim, involved in making a market can facilitate investors' orders during periods of high demand by engaging in short selling, which is selling shares that the market maker does not yet own.  If the market maker can sell short at one price, and later purchase shares at a lower price, the market maker will earn a profit.  Anglim had a secret backchannel arrangement with certain Control Persons to use the trading accounts at his brokerage firms to engage in market-making activity for stock being sold in large amounts by the Control Persons.

## FACTUAL ALLEGATIONS

19.     During the Relevant Period, Anglim communicated regularly with certain Control Persons that dominated the supply of stock for certain small publicly-traded companies. Through the use of various nominee entities, the Control Persons held enough shares of stock to be undisclosed affiliates of the issuer.  In numerous instances, the Control Persons did not register the offer or sale of the shares they were selling and could not rely on an exemption from registration.

20.     The Control Persons engaged in deceptive schemes to make it appear that the shares they actually controlled were owned by multiple unaffiliated entities when, in reality, those entities held the stock as nominees for the Control Persons.  The Control Persons typically controlled virtually all of the public float for each company in their respective schemes.  The Control Persons then engaged in fraudulent schemes to mislead the market regarding their ownership of the stock and to sell those millions of shares at manipulated prices through Anglim under the cover of his firms' market making activities.

21.     While the Control Persons were not actual customers of the broker-dealers firms where Anglim worked, Anglim entered into arrangements with them to facilitate the sale of the Control Persons' shares through his firms.

22.     Anglim communicated with these Control Persons using secure mobile communications applications like WhatsApp and Silent Circle, an encrypted application with a feature that allows users to destroy sensitive messages after a certain time.  These communications methods were outside of his firms' authorized methods of business communications, were not monitored by his firms and were used to evade his firms' monitoring requirements.  Thus, Anglim's communications with these Control Persons were not supervised by his employers.

23.     Anglim knew, or was at least reckless as to whether, the Control Persons with whom he communicated controlled the supply, or public float, of the stock they asked him to sell.  Anglim knew about, or was at least reckless as to the fact of, their control in part because he was aware that these securities were infrequently traded, or did not trade at all, before he began trading in them at the Control Persons' requests.

24.     In each instance, the Control Persons' schemes began by accumulating enough of an issuer's shares that they controlled the public float, and depositing such shares with multiple offshore brokerage firms, in the names of nominees, to disguise the Control Persons' actual ownership and control over those shares.  In certain instances, the Control Group then stoked artificial demand for the issuer's stock through manipulative trading and stock promotions using aggressive sales communications or boiler rooms.

25.     Retail investors then typically purchased the issuer's stock on the basis of the manipulated price and volume information, which retail investors typically rely upon to make

investment decisions.

26.     While he did not participate in the Control Persons' stock promotions, Anglim's trading on behalf of the Control Persons made it appear to the market that the increase in trading volume was solely the result of independent investors' demand for the shares.

27.     Anglim's role in each deal was the same.  A Control Person initially tipped him off that they, or their group, had shares to sell, indicating the number of shares that would be available for purchase, and often specific prices Anglim should quote or a target bid price for the company's shares.

28.     Anglim then sold short the shares of the company identified by the Control Persons, through his firm's proprietary trading accounts, at prices suggested by the Control Persons.  Anglim traded with the expectation that he would cover his short position by purchasing at the end of the day from the Control Persons who intended to liquidate huge blocks of stock.

29.     At the end of the trading day, Anglim typically arranged trades with Control Persons to cover his short positions by buying from the Control Persons, often at pre-arranged prices.  Once a Control Person had liquidated the number of shares he wanted to sell each day, the Control Person told Anglim temporarily to stop placing trades in the stock.  Anglim understood that the Control Persons' limits were related to the quantity of shares their brokerage firms would permit them to sell in a particular day.  Anglim obliged and would then wait for instructions about when the Control Persons would have more shares available to sell, sometimes referred to as "re-loading" more shares.

30.     In addition, Anglim sometimes placed trades at prices directed by the Control Persons to help manipulate the price of a stock or give the appearance of a more liquid market

for the stock.  For example, Anglim was occasionally asked to, and did, place trades at the end of the trading day to lift a stock's price so that its reported "closing price" would be increased.

31.     At other times, Anglim also used his firms' trading accounts to make purchases at the request of the Control Persons in order to manipulate increases in a stock's price.  Anglim also participated in several arranged "first trades" with Control Persons.  A first trade is the initial trade in a stock, or a trade made in a security that has not been traded in a long time, often after a major corporate action like a name change or stock split.

32.     In addition to trading in his employers' trading accounts, Anglim sometimes also traded in his personal brokerage account in the stocks he was trading at the Control Persons' request.  Anglim would sometimes buy shares in the companies he knew the Control Persons were selling, and then would sell those shares during the Control Persons' promotions.  As a result, he reaped additional personal gains.

33.     Some examples of the schemes are detailed below.

### Example 1: Proto Script Pharmaceutical Corp.

34.     By  December 2016, Control Persons led by Luis Carrillo[1] ("Carrillo Control Group") had amassed over 85% of Proto Script Pharmaceutical Corp.'s (OTC: PSCR) ("Proto Script") purportedly unrestricted stock and deposited the shares with a Switzerland-based entity called Wintercap SA,[2] which claimed to be an asset manager.  Thus the Carrillo Control Group,

---

[1] Carrillo is a defendant in pending criminal and civil fraud cases.  *See United States v. Sharp et al.,* No. 1:21-mj-07182-JCB-2 (D. Mass. filed Aug. 4, 2021); *SEC v. Carrillo et. al.,* No. 1:21-cv-11272-WGY (D. Mass. filed Aug. 4, 2021).

[2] The principal of Wintercap SA, Roger Knox, pled guilty to securities fraud and conspiracy to commit securities fraud in connection with the activities of Wintercap SA that are described in the Complaint. *United States v. Knox*, 18-cr-10385-NMG (D. Mass.) (guilty plea entered Jan. 13, 2020).  Knox and Wintercap also consented to civil judgments imposing remedies for securities fraud.  *See SEC v. Knox et. al.*, No. 1:18-cv-12058 (D. Mass.) (judgments entered Dec. 21, 2022).

through nominee accounts at Wintercap, controlled more than 85% of Proto Script's public float.

35.    On December 14, 2016, the Carrillo Control Group began promoting Proto Script's stock by hiring a boiler room based in Medellin, Colombia to solicit investors (the "Medellin Room").[3]  Though there was very little trading in Proto Script prior to the promotion, over 5.8 million shares of Proto Script stock traded during the first three days of the promotion from December 14 to 16, 2016.

36.    The Carrillo Control Group's efforts to promote Proto Script stock led to a significant increase in the price and volume of that stock from December 2016 to February 2017, as shown in the chart below.



37.    Anglim first began actively quoting Proto Script stock on December 14, 2016

---

[3] The Commission filed civil fraud charges against five individuals in connection with the Medellin Room.  *See SEC v. Biller, et al.*, No. 1:22-cv-01406 (E.D.N.Y. filed March 14, 2022).

under his employer's market maker code.  The Carrillo Control Group sold over 1.9 million shares of Proto Script stock during the first three days of the promotion while Anglim, though his firm, facilitated the Carrillo Control Group's liquidation by buying and selling over 1.8 million shares of Proto Script stock during the same time three-day span.

38.    The Carrillo Control Group sold approximately 7 million shares of Proto Script from December 14, 2016 through February 17, 2017 for a total of more than $2.8 million in trading proceeds.  Anglim ceased trading in Proto Script stock shortly after the Carrillo Control Group stopped selling Proto Script stock.

39.    Approximately 97% of Anglim's total sales volume of Proto Script stock was conducted during the period of time in which the Carrillo Control Group was selling in coordination with the Medellin Room promotion for which it paid.  Anglim's last trade in Proto Script was on March 6, 2017.  Between August 2016 and March 2017, Anglim's firm's proprietary trading account bought and sold approximately 9.5 million shares of Proto Script, which resulted in net trading profits of $145,126 to the firm, of which Anglim's commission constituted $72,563.

40.    In addition to facilitating trades for the Carrillo Control Group through his employer's market making capabilities, Anglim also traded in advance of the Proto Script promotion in his personal brokerage account.  Before the Carrillo Control Group's promotion began, Anglim bought 47,000 shares of Proto Script at $0.32 per share for a total of $15,040. Anglim later sold his 47,000 shares of Proto Script during the promotional period (from December 16, 2016 to January 10, 2017) for a total of $41,918, netting a profit of $26,878. Combined with the $72,563 in commissions he received from his employer, Anglim's profits from trading in Proto Script for and with the Carrillo Control Group totaled $99,441.

Example 2: Digatrade Financial Corp.

41.    During the Relevant Period, Bradley J. Moynes[4] was the Chief Executive Officer and Chairman of Digatrade Financial Corp. (OTC: DIGAF) ("Digatrade"), a publicly traded company based in Vancouver, British Columbia, Canada.

42.    Between about September 2014 and April 2016, Moynes engaged in a fraudulent scheme to sell Digatrade securities into the public markets while concealing his control of those shares through nominee companies.  Moynes' scheme used the services of Frederick Sharp and his employees to sell his Digatrade shares illegally.[5]  Carrillo became involved in Moynes' scheme in mid-2016.  In July and August 2016, Moynes took steps to re-establish his control over the public float of Digatrade by decreasing the number of Digatrade's shares and then causing Digatrade to issue new, and purportedly unrestricted, shares to nominee entities that Moynes and Carrillo could control.

43.    By the end of 2016, Moynes, Carrillo and their associates (the "Digatrade Control Group") controlled approximately 97% of Digatrade's public float and Moynes also controlled a significant block of Digatrade's restricted shares.  The Digatrade Control Group owned their shares of the public float through various overseas brokerage accounts they controlled through their associates.  The Digatrade Control Group then began to promote and sell the Digatrade

---

[4] The Commission charged and obtained judgments against Moynes and Digatrade in a separate case alleging that they engaged in a deceptive scheme to hide their sales of Digatrade stock to unsuspecting retail investors.  Without admitting or denying the allegations of the Commission's complaint, Moynes and Digatrade consented to the entry of final judgments enjoining them from violating the securities laws. The final judgments also imposed penny stock bars against Moynes and Digatrade and imposed an officer and director bar, disgorgement, and a civil penalty against Moynes.  *See SEC v. Moynes, et al.,* No. 1:22-cv-11006 (D. Mass. judgments entered Mar. 8, 2023).

[5] Sharp and his associates are defendants in a Commission action alleging that they facilitated unlawful stock sales to retail investors for many different Control Persons.  *See SEC v. Sharp et al.,* No. 1:21-cv-11276 (D. Mass. Filed Aug. 5, 2021).

shares they controlled.

44.    Carrillo hired the Medellin Room to solicit investors in a promotional campaign
that started on November 1, 2016.  In the two months prior to the promotion, trading in
Digatrade was sparse.  However, in the first two days of the Digatrade promotion, the price and
volume of Digatrade soared.

45.    In particular, over two days, November 1 and 2, 2016, brokerage accounts
controlled by the Digatrade Control Group sold approximately 4.5 million shares of Digatrade
(over 50% of the company's public float), generating approximately $2.3 million in trading
proceeds.  Despite that heavy selling, Digatrade's stock price rose from a closing price of $0.13
per share on October 31, 2016 to a closing price of $0.59 per share on November 1, and peaked
at $0.96 per share on November 14, 2016, as reflected in the chart below.



46.    Through his firm's proprietary trading account, Anglim initiated quoting on Digatrade on the first day of the Digatrade Control Group's promotion.  Trading records show that Anglim's firm was leading the bid price increases for Digatrade shares that day.  In other words, Anglim offered to buy Digatrade shares in the market at increasing prices throughout the day on November 1, 2016.

47.    Over 8.2 million shares of Digatrade traded in the market during November 1-2, 2016 compared to less than 32,000 shares for the whole month of October.  Over those two days, the Digatrade Control Group sold approximately 4.5 million shares of Digatrade and Anglim facilitated their liquidation by buying and selling approximately 3 million shares of Digatrade using his firm's market maker trading account.

48.    From November 1, 2016 through May 1, 2017, the period in which Anglim was trading in Digatrade using his firm's market maker trading account, the Digatrade Control Group sold approximately 12.3 million shares of Digatrade for approximately $3.4 million in proceeds.

49.    Anglim's firm's market maker trading account bought and sold approximately 11.2 million shares of Digatrade between November 2016 and May 2017 and the firm's net trading profit totaled $123,862, of which $61,931 was paid to Anglim in commissions.

50.    Anglim also traded in Digatrade in his personal brokerage account.  On or about December 6, 2016, after the initial promotion, Digatrade's price dropped to a low of $0.28 a share.  That day, Anglim bought on the dip in price by purchasing 98,000 shares of Digatrade at an average price of $0.29 per share in his personal brokerage account.

51.    On the same day, December 6, 2016, Anglim continued to trade Digatrade for the Digatrade Control Group by buying 403,714 shares and selling 392,850 shares in his firm's proprietary trading account.  By the end of that day, the price had increased and Anglim switched

to selling Digatrade shares in his personal brokerage account. That day, he sold 22,600 Digatrade shares at an average price of $0.37 per share, resulting in a single day gain of 29% per share.

52.     The total trading volume for Digatrade on December 6 amounted to 1,364,894 total shares, of which Anglim's market making and personal trading accounted for 917,164 shares, or approximately 67% of total volume. Digatrade shares closed at $0.40 on December 6, 2016, up 25% from the prior day's close.

53.     In his personal brokerage account, Anglim sold most of the rest of his shares of Digatrade over the next week and by the end of December 2016, Anglim had made a total profit of $14,222 on his initial $28,473 purchase of Digatrade shares. Anglim's Digatrade commissions and personal trading profits thus totaled $76,153.

<u>Example 3: 12 Retech Corporation</u>

54.     By the end of June 2017, Carrillo and his associates (the "12 Retech Control Group") controlled over 99% of the public float of 12 Retech Corporation (OTC: RETC) ("12 Retech"). The 12 Retech Control Group held all of those shares through brokerage accounts in the names of nominee entities at Wintercap SA. The first-ever trading day of 12 Retech was on June 27, 2017. On that day, the 12 Retech Control Group began selling the shares of 12 Retech that they controlled.

55.     The efforts of the 12 Retech Control Group to sell their shares, most likely in connection with promotional activities, was successful for a short time at increasing the price and volume of 12 Retech shares, as shown in the chart below.



56.     On June 27, 2017, Anglim first began actively acting as a market maker for 12 Retech through his firm's account by quoting both bid and ask prices for that stock.

57.     Communications among Carrillo and Wintercap SA personnel confirm that Carrillo was directing Anglim's firm regarding selling shares of 12 Retech.  In one September 1, 2017 communication using an encrypted application, a Wintercap employee messaged Carrillo, "Want to chip away at some RETC today?" to which Carrillo replied, "I have MICA in there. Will send order soon."

58.     MICA was the code word that Carrillo and Wintercap personnel used for Anglim. About thirty minutes later, Carrillo wrote, "Sell 250k retc at .062."  Indeed, Anglim and his firm were active in trading 12 Retech that day – by buying a total of 165,900 shares at an average price of $.062 per share and by selling 170,416 shares of 12 Retech at an average price of $.071

per share.

59.     Between June 27, 2017 and November 21, 2017, the 12 Retech Control Group

sold approximately 19.2 million shares of 12 Retech for total proceeds of approximately $8.2

million.  During the same period, Anglim facilitated the 12 Retech Control Group's liquidation

by using his firm's market maker trading account to buy and sell 12,635,964 shares of 12 Retech

for a net trading profit of $241,591, of which Anglim's commissions amounted to $120,795.

<u>Example 4: Homie Recipes Inc.</u>

60.      As of August 1, 2017, Carrillo and his associates controlled over 99% of the

public float of Homie Recipes Inc. (OTC: HOMR) ("Homie") shares through nominee entities

Carrillo had the authority to direct, including through Wintercap.

61.     Carrillo and his associates began actively trading in Homie stock on August 4,

2017.  They continued to sell their shares through late September 2017.  As shown in the chart

below, the efforts of Carrillo and his associates to sell their shares of Homie stock, most likely in

connection with promotional activities, were successful in increasing the price and volume of

Homie stock.



62.     The same day Carrillo began trading Homie stock, August 4, 2017, Anglim first began acting as a market maker for Homie stock through his firm's account by quoting both bid and ask prices for that stock.  That day, Anglim bought 4,000 shares of Homie stock in his firm's market maker trading account at a price of $0.60 a share.  Four days later, on August 8, 2017, Anglim sold those 4,000 shares for $1.05 per share.

63.     Communications between Carrillo and Wintercap personnel confirm that Carrillo was directing Anglim to buy and sell shares of Homie, like Carrillo had directed Anglim to trade in 12 Retech.  In one September 11, 2017 communication using an encrypted application, Carrillo, who was directing Wintercap's sales of Homie stock, told Wintercap personnel that "MICA was hungry," indicating that Anglim had traded a significant number of Homie shares that day.  Trading records for September 11, 2017 confirm that Anglim's purchases and sales of

Homie stock through his firm's market maker trading account created volume of just over 400,000 shares that day.

64.     Between August 4, 2017 and September 28, 2017, Carrillo sold approximately 11.84 million shares of Homie for total proceeds of approximately $5.2 million.  During the same period, Anglim facilitated Carrillo's liquidation by using his firm's proprietary trading account to buy and sell 6,245,077 shares of Homie stock for a net trading profit of $112,471, of which Anglim's commissions amounted to $56,235.

<u>Example 5: Charlestowne Premium Beverages, Inc.</u>

65.     In December 2019 and January 2020, Charlestowne Premium Beverages, Inc. (OTC: FPWM) ("Charlestowne") issued two share certificates for 2,500,000 shares each to two Hungarian companies: Wellesley Holdings, Ltd. and Porrima, Ltd., which were nominee entities used by a securities law recidivist who, at the time, was paying for Charlestowne's business expenses.[6]  Though the shares were issued to Wellesley and Porrima as unrestricted shares, the shares should have been restricted because Wellesley and Porrima were affiliates of Charlestowne.  Wellesley and Porrima then deposited their shares with a Cayman Islands-based broker-dealer named Valor Capital.

66.     By early 2021, over 97% of Charlestowne's float had been deposited with accounts at Valor Capital.  Valor Capital was secretly controlled, in part, by Joseph Padilla, a recidivist securities law violator.[7]

---

[6] Both Wellesley and Porrima were charged by the Commission with securities fraud.  *See SEC v. Page, et al*, No. 1:21-cv-05294 (E.D.N.Y. filed Sept. 23, 2021).  The clerk has entered default against them and the Commission has sought the entry of default judgments against them.

[7] Padilla has been charged twice by the Commission.  The first time, he was charged with violating the registration provisions of the Securities Act. Padilla agreed to a settlement of that action, including a bar from association with any broker-dealer.  *See SEC v. Ruettiger et. al.,* No. 2:11-cv-02011 (D. Nev. filed Dec. 16, 2011).  More recently,

67.     Charlestowne's stock had very little trading activity until mid-February 2021. From January 1, 2021 through February 17, 2021, trading in Charlestowne was very limited and consisted of only 20 days of trading with average volume of 270 shares traded per day at prices ranging from $0.36 - $0.58 per share.  On February 17, 2021, the price of Charlestowne's stock closed at $0.36 per share.

68.     Beginning on February 18, 2021, Padilla orchestrated purchases of Charlestowne shares through his own brokerage account, and at least 4 other brokerage accounts he controlled. Padilla's actions in making these purchases at progressively increasing prices caused Charlestowne's stock price to rise significantly.

69.     Anglim also began publishing a quoted price for Charlestowne on behalf of his firm during the day on February 18, 2021.  At Padilla's direction, Anglim used his firm's market making trading account to purchase Charlestowne stock during that day.

70.     Charlestowne's stock price rose to $1.80 per share during the day on February 18, 2021 and closed at $0.90 per share (a 150% increase from the prior day) on 25,003 shares of volume (nearly five times the total volume from January 1 – February 17).  Padilla -controlled accounts were responsible for over 80% of the buy-side volume.

71.     After increasing Charlestowne's price through manipulative trading, Padilla then began directing sales of Charlestowne stock from the Valor Capital accounts into the market. Anglim began facilitating Padilla's liquidation of Charlestowne stock starting on February 25, 2021 by acting as a market maker for Charlestowne stock through his firm's account by quoting both bid and ask prices for that stock.  On that day, Padilla directed sales of 28,000 shares of

_____

the Commission sued Padilla for securities fraud, including conduct relating to Charlestowne.  *See SEC v. Padilla et al.*, No. 23-cv-11331-RGS (D. Mass. filed June 13, 2023).

Charlestowne stock at a price of $1.97 per share on behalf of Valor Capital.  Anglim sold short

and then bought 28,000 shares through his firm's market making trading account at a price of

$1.97 per share.   Later that day, Padilla also directed sales of an additional 45,689 shares

through Valor Capital at an average price of $2.43 per share.

72.     Valor Capital's sales during March and April 2021 took place during a period

when Charlestowne Beverages was the subject of a promotional emails and online articles,

including those from companies named pennystockbargain.com and the-financialnews.com.  For

instance, an April 15, 2021 promotional article described Charlestowne Beverages stock as being

"poised to jump over 700%."

73.     The effects of Padilla's and Anglim's trading, in combination with the

promotions, are shown in the chart below.



74.     Between February 22, 2021 and April 19, 2021, Padilla directed sales of approximately 2.3 million shares of Charlestowne stock through Valor Capital accounts for proceeds of over $7 million.  Between February 18 and May 5, 2021, Anglim used his firm's market making account to buy and sell approximately 1.28 million shares of Charlestowne.  In total, Anglim's firm netted $106,734 in proceeds, of which $53,367 was paid in commissions to Anglim.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
**(Violations of Section 17(a)(1) and (3) of the Securities Act)**

75.     Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

76.     During the Relevant Period, the stock of Proto Script, Digatrade, 12 Retech, Homie, and Charlestowne was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

77.     By reason of the conduct described above, Anglim, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite state of mind (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

78.     By reason of the conduct described above, Anglim violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)].

### SECOND CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder)**

79.     Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

80.     During the Relevant Period, the stock of Proto Script, Digatrade, 12 Retech, Homie, and Charlestowne was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)].

81.     By reason of the conduct described above, Anglim, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

82.     By reason of the conduct described above, Anglim violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R §240.10b-5(a) and (c)] thereunder.

## THIRD CLAIM FOR RELIEF
## MARKET MANIPULATION
### (Violations of Section 9(a)(1) of the Exchange Act)

83.     Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

84.     During the Relevant Period, the stock of Proto Script, Digatrade, 12 Retech, Homie, and Charlestowne was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)].

85.     By reason of the conduct described above, Anglim, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any

national securities exchange, for the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security: (A) effected any transaction in such security which involves no change in the beneficial ownership thereof, or (B) entered an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (C) entered any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

86.     By reason of the conduct described above, Anglim violated Exchange Act Section 9(a) [15 U.S.C. §78i(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.     Permanently restrain Anglim, his agents, servants, employees and attorneys, and those persons in active concert of participation with them who receive actual notice of the injunction by personal services or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Sections 9(a) and 10(b) of the Exchange Act [15 U.S.C. §§78i(a), 78j(b)], and Rule 10b-5 thereunder [17 C.F.R §240.10b-5];

B.     Order Anglim to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

C.      Enter an order barring Anglim from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.      Grant such other further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

The Commission demands a jury in this matter for all claims so triable.

DATED: July 17, 2023

Respectfully submitted,

/s/ Kathleen Burdette Shields
Kathleen Burdette Shields (Mass Bar No. 637438)
William J. Donahue (Mass Bar No. 631229)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct)
(617) 573-8915 (Donahue direct)
(617) 573-4590 (fax)
ShieldsKa@sec.gov (Shields email)
Donahuew@sec.gov (Donahue email)